UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
SARNO REALTY, INC. a/k/a SARNO          )
REALTY; MASS CABINETS, INC.; and        )
NORTHEASTERN SCALE LUMBER               )
COMPANY, INC. a/k/a NORTHEASTERN        )
SCALE LUMBER COMPANY,                   )
                                        )
            Plaintiffs,                 )          Civil Action No.
                                        )          20-10924-FDS
      v.                                )
                                        )
SELECTIVE INSURANCE COMPANY             )
OF THE SOUTHEAST,                       )
                                        )
            Defendant.                  )
_____)

MEMORANDUM AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT, DEFENDANT'S MOTIONS
TO EXCLUDE TESTIMONY, AND PLAINTIFFS' MOTION TO STAY

SAYLOR, C.J.

        This is a dispute concerning insurance coverage after a fire.  Plaintiffs Sarno Realty,

Mass Cabinets, Inc., and Northeastern Scale Lumber Company, Inc. have sued Selective

Insurance Company of the Southeast, alleging breach of contract and violations of Mass. Gen.

Laws ch. 93A.  The specific dispute arises out of a policy endorsement that provides coverage

for increased costs to the extent they "result[] from enforcement of an ordinance or law."

        The parties have cross-moved for summary judgment.  Defendant has also moved to

exclude the testimony of two experts for plaintiffs, John Constance and Bryan Murphy.  For the

reasons set forth below, the Court will grant defendant's motion for summary judgment, and

deny plaintiffs' motion to the same extent.  In light of the disposition of the motions for summary

judgment, the Court will deny as moot defendant's motions to exclude testimony and plaintiffs'

motion to stay.

## I.  <u>Background</u>

### A.  <u>Factual Background</u>

The following facts are as set forth in the record and are undisputed except as noted.

#### 1.  <u>The Parties</u>

Sarno Realty, Inc., Mass Cabinets, Inc., and Northeastern Scale Lumber Company, Inc., are three corporations owned and operated by Michael Sarno.  (Sarno Dep. 9).  The companies are located at 99 Cross Street in Methuen, Massachusetts.  (*Id.* at 10).  Sarno Realty owns the property and facility at 99 Cross Street.  (*Id.*).  Mass Cabinets manufactures commercial and residential cabinets for general contractors.  (*Id.* at 11).  Northeastern Scale Lumber manufactures miniature wood moldings for dollhouses and model train layouts.  (*Id.*).

Selective Insurance Company of the Southeast is an insurer that issued a commercial insurance policy to plaintiffs.  (Def. Ex. 3; Pls. Ex. 1).

#### 2.  <u>The Facility</u>

The facility at 99 Cross Street has both manufacturing and office space.  (*See* Sarno Dep. 106).  It was built in approximately 1967 and is about 20,000 square feet in area.  (*Id.* at 12, 20; Def. Ex. 2, 2).

The facility is equipped with, among other things, a fire-sprinkler system, a fire-alarm system, a paint-booth system, a glue-booth system, a Titan makeup air unit, a dust-collection system, and overhead Modine heaters.  (Pls. Ex. 6).

The dust-collection system gathers sawdust from the woodworking process.  The original system was installed in the 1970s.  (Sarno Dep. 19-20).  Prior to the fire, it was working properly, and no code violations or safety concerns were ever identified.  (*Id.* at 24, 53).  In 2013, Mass Cabinets hired Dustpipe.com, LLC to replace a rotted exterior pipe.  (Sarno Dep. 25-26).

The invoice describes the work performed as "[r]epairs to the present old cyclone unit and the storage tank/cyclone of the building central dust collection system." (Def. Ex. 5). Sarno characterized the work as "a repair to the existing system, central dust collection." (Sarno Dep. 26). The repairs cost $6,545. (Def. Ex. 5). Plaintiffs did not replace the entire dust-collection system, and no representative of the city at that time required it. (Sarno Dep. 32). They also did not seek a building permit from the city. (*Id.*). Sarno did not know whether the dust-collection system was code compliant after completing the 2013 repairs because he was "not a code expert." (*Id.* at 34-35).

The facility also contains hanging heaters manufactured by Modine. (Quinlan Dep. 30, 41-42). Prior to the fire, a city gas inspector named James Quinlan visited the facility and expressed concern about having open-flame Modine heaters with "that much dust collection." (*Id.* at 21-24). According to Sarno, another gas inspector later told him that the heaters could be turned back on. (Sarno Dep. 55-57). The heaters were in service prior to the fire, and no further safety concerns were identified. (*Id.*).

### 3.     The Insurance Policy

From January 1, 2017, to January 1, 2018, Sarno Realty, Mass Cabinets, and Northeastern Scale Lumber were insured under a commercial insurance policy issued by Selective. (Pl. Ex. 1).

Central to this dispute is an endorsement entitled "ElitePac Property Extension Endorsement." (*Id.* at 122). The endorsement "modifies insurance provided under . . . [the] Building and Personal Property Coverage Form." (*Id.*). It provides as follows:

**Ordinance or Law**

The **Increased Cost of Construction Additional Coverage** is deleted and replaced by the following Ordinance Or Law Coverage Extension:

You may extend the insurance that applies to Building as follows:

1. If there is direct physical loss or damage to described premises caused by or resulting from a Covered Cause of Loss we will pay the following to the extent it results from enforcement of an ordinance or law:

. . .

   **c. Coverage C.** The increased cost to:

   (1) Repair or reconstruct damaged portions of the same building; and/or

   (2) Reconstruct or remodel undamaged portions of the same building, whether or not demolition is required.

   However:

   (1) This coverage applies only if the restored or remodeled building is intended for similar occupancy as the current building, unless such occupancy is not permitted by zoning or land use ordinance or law.

   (2) We will not pay for the increased cost of construction if the building is not repaired, reconstructed or remodeled.

   . . .

2. The ordinance or law must:

   a. Regulate the demolition, construction or repair of buildings or establishes zoning or land use requirements at the described premises; and

   b. Be in force at the time of loss.

3. We will not pay under this Coverage Extension for:

   a. Loss due to any ordinance or law with which:

   (1) You were required to comply before the loss, even if the building was undamaged; and

   (2) You failed to comply.

   . . .

(*Id.* at 127-28).  The limit of liability for Coverage C - Increased Cost of Construction is

$500,000.  (*Id.* at 64-66).

### 4.    The Fire

On April 13, 2017, a fire occurred at the facility at 99 Cross Street.  (Def. Ex. 4, 1; Sarno

Dep. 14-15).  It originated on a workbench toward the back of the manufacturing area.  (Def. Ex.

4, 5).  It was contained to the manufacturing area and later extinguished by the Methuen Fire

Department.  (*Id.* at 1; Murphy Dep. 65).

Plaintiffs contend that the fire caused extensive fire, smoke, and water damage to the

structure, and that heavy smoke permeated the building.  (Dickover Dep. 120, 123).  Selective

disputes that characterization, stating that damage to the facility was quite limited.  For example,

the only parts of the dust-collection system damaged by the fire were certain indoor ductwork

and individual drops to work stations.  (Murphy Dep. 69-70; Sarno Dep. 60; Davis Dep. 36, 41,

49, 61).  Sarno was not aware of any fire damage to the sprinkler system in the office area.

(Sarno Dep. 63).

### 5.    The Insurance Claim

Plaintiffs retained Petrocelli Public Insurance Adjusters, Inc. to represent them in their

insurance claim relating to the fire.  (Def. Ex. 14, 4).  They submitted an initial property damage

claim to Selective on April 13, 2017.  (*Id.*).  That same day, a representative from Selective

showed up at the facility.  (Sarno Dep. 137).  After the investigation and adjustment process,

Selective paid claims for the building, business personal property/contents, and certain extra

expenses.  (Def. Ex. 20, 6).  To date, it has paid approximately $2,000,000 in claims relating to

the fire.  (Sarno Dep. 137).

Two years later, in April 2019, plaintiffs submitted an "ordinance or law claim" under the

policy.  (Def. Ex. 15; Pls. Ex. 8).  The ordinance or law claim sought the following:

Replacement of Modine hanging heaters: $64,015.80

Spray booth fire sprinkler installation: $29,274.85
Sprinkler Upgrades required by code: $60,043.29
Fire alarm upgrades: $26,952.85
Electrical - glue booth: $2,100.00
Refurbish - glue booth: $10,025.00
Dust Collection system: $316,659.00
Dust Collection system: $82,920.00
Dust Collection system: $22,168.00
Make up air system for spray booth: $46,500.00
Titan Air unit for the Make up air system for spray booth: $40,513.00

(Def. Ex. 16).  The total amount of the ordinance or law claim was $701,171.79.  (Resp. Req. for

Admis. 6).[1]

Selective retained Brian Vanderhoff of J.S. Held, a construction consulting firm, to

provide a repair estimate, including an estimate for damage to the dust-collection system.

(Dickover Dep. 36-37; Davis Dep. 35-36; Def. Ex. 18).  Based on the J.S. Held estimate,

Selective paid plaintiffs for certain repairs to the dust-collection system, including damaged

ductwork.  (Def. Ex. 20).  It also paid for fire-alarm upgrades because they qualified as direct

building damage.  (Dickover Dep. 81).  And it paid $116,287.85 for the spray booth fire

sprinkler, the make-up air system for the spray booth, and the Titan Air unit.  (Resp. Req. for

Admis. 6).[2]  However, the remaining $383,712.15 of the $500,000 limit of liability was (and is)

disputed.  (*Id.*).

Selective also retained James Brandon Davis from J.S. Held to perform a code

compliance review and analysis.  (Def. Ex. 2; Def. Ex. 14, 54).  Davis's report concluded that

---

[1] Plaintiffs' memorandum lists the total claim as $701,179.71, which appears to be a typographical error. (Pls. Mem. at 5).

[2] Exhibit 20 explicitly states that Selective has paid $116,287.85.  This is confirmed elsewhere in the record.  (*See* Compl., Ex. 6).  Defendant states that it has paid $116,287.26, which appears to be a typographical error.  (Def. SMF ¶ 61).  And plaintiffs elsewhere contend that they "have been paid $116,287.86" meaning that the "dispute relates to the remaining $383,712.15 of the $500,000.00 Ordinance or Law Coverage."  (Pls. Mem. at 6).  This also appears to be a typographical error.

plaintiffs' "[u]pgrades to fire protection and mechanical systems were elective decisions, or were required due to elective decisions, and were not required by building codes, fire codes, or the local authorities having jurisdiction."  (Def. Ex. 2, 1).

On August 20, 2019, Selective sent a letter to plaintiffs disclaiming coverage for the rest of the ordinance or law claim.  (Def. Ex. 23; Pls. Ex. 9).  The letter stated, in part, that the "upgrades or modification[s] are the result of elective decisions or were required due to elective decisions or the result of voluntary alterations being undertaken by Mass Cabinets."  (*Id.*).  The basis for the disclaimer was that "the building could have been returned to its pre-loss condition, without upgrade, in accordance [with] the repair provisions of the 2015 IEBC [International Existing Building Code]."  (*Id.* at 2).

Selective's disclaimer primarily concerned three items:  the dust-collection system, the sprinkler system, and the Modine heaters.

### a.    Dust-Collection System

Sometime prior to May 30, 2018, plaintiffs decided to replace the dust-collection system. (Sarno Dep. 90).[3]  That decision was made after consulting with Bryan Murphy from Dustpipe, who told them that repair was not possible because it would not comply with the current building code.  (Sarno Dep. 89-90, 98).  In the summer of 2018, Murphy sent plaintiffs a quote for the price of a new dust-collection system.  (Sarno Dep. 99; Def. Ex. 2).  Sarno said he needed to "figure it out, read the quote, determine the scope of the work," and have a meeting to better understand it.  (Sarno Dep. 99).

---

[3] Plaintiffs dispute that fact, contending that "[i]n response to a question posed by Bryan Murphy regarding the machinery in the building for purposes of Mr. Murphy's calculation of the necessary capacity of the dust collector, the plaintiffs were told by Mr. Murphy that repairs to the dust collector were not possible and left them with no option but to replace the dust collector that 'met current code.'"  (Pls. Resp. SMF at 11).  However, they do not specifically rebut the contention that they decided to replace the system sometime before May 30, 2018.

On October 24, 2018, Sarno emailed Murphy, writing that "[w]e are not sure how this will go with [the] insurance company.  But I think it[ ] [is] time to upgrade the system, this ma[y] mean out of pocket money."  (Def. Ex. 24).  Sarno later explained this email during his deposition, testifying that plaintiffs were "not sure how it would go with the insurance company . . . it appeared we were submitting a code claim upgrade . . . . We're trying to run a business.  I don't know how this is going to go."  (Sarno Dep. 116).  Plaintiffs ultimately purchased the new dust-collection system from Dustpipe on November 16, 2018, and submitted final payment on December 26, 2018.  (Murphy Dep. 162-163; Def. Ex. 21).

The total cost of the new dust-collection system was $421,747.  (Def. Ex. 16).[4]  That amount included new indoor/outdoor ductwork, filters, fans, and other system components at a cost of $316,659; site work, including a thicker concrete pad for a new dumpster at a cost of $82,920; and energy-efficiency upgrades at a cost of $22,168.  (Def. Ex. 21, 22, 31).  The initial replacement estimate for the principal portion of the job was approximately $261,000, but an "inside pipe reconfiguration" resulted in an increased price of $316,659.  (Murphy Dep. 150-51).  The estimate also apparently increased based on energy-efficient upgrades that were not required by any building code, including approximately $8,000 for a "super energy-efficient direct drive

---

[4] Plaintiffs add that defendant has stipulated as to the replacement cost and actual cash values of the upgrades to the sprinkler system, dust-collection system, and Modine heaters.  (*See* Dickover Dep. 41) (stating that it is his understanding that the dispute is about the availability of coverage, not the amount).  Defendant also admitted two requests for admissions relevant here.  The first stated that "[t]he amount of the plaintiffs' ordinance or law/increased cost of construction claim is undisputed."  (Resp. Req. for Admis. 5).  The second stated that "[t]he plaintiffs and the defendant agree on the replacement cost and actual cash values of the claimed upgrades to the sprinkler, dust collection and certain other mechanical systems (including, but not limited to, the Modine heaters) at the Property."  (*Id.*).  The parties have also executed a First Amended Tolling Agreement, which provides in relevant part:

> Though the Insureds and Selective agree on the replacement cost and actual cash values of claimed upgrades to the sprinkler, dust collection and certain other mechanical systems (including but not limited to, the Modine heaters) as set forth in Tab A, the Insureds and Selective disagree with respect to whether there is coverage for these claimed upgrades under the Policy.

(Def. Ex. 6, 1).

motor."  (*Id.* at 152-53; Def. Ex. 21).

At his deposition, Murphy testified that repairing damage to the dust-collection system ductwork, as opposed to replacing it entirely, would have cost "in the neighborhood of" $40,000. (Murphy Dep. 209).  However, he qualified that statement by saying "I don't know, because you need all the parts, you need trucking and installation in order to put it all up.  So I don't know.  I don't know."  (*Id.*).  He then testified that the building code mandated the $420,000 expenditure for the new system.  (*Id.* at 210).

On March 28, 2019, Sarno emailed Murphy, requesting that he "produce a document that is code related to the requirement of the new dust system" because he needed to submit evidence that "the work was required due to current code."  (Def. Ex. 26).  As to that e-mail, Sarno testified at his deposition that he did not "know if Murphy put anything in writing to the fire prevention office prior to this date, but [he] did not have anything in writing to submit to Selective prior to this date."  (Sarno Dep. 126).

### b.   Sprinkler System and Modine Heaters

On June 6, 2018, Sarno met with Red Star Construction Services, a contractor, to discuss "code upgrades" for the sprinkler system and Modine heaters.  (Def. Ex. 27; Sarno Dep. 104-07).[5]  From that fact, Selective infers that Sarno chose to upgrade the Modine heaters and sprinkler system at that time.  (Def. SMF ¶ 72).  There is some support for that in the meeting agenda, which states "Code upgrades.  Going for it.  Pending fire prevention meeting."  (Def. Ex. 27).  Plaintiffs, however, contend that the meeting was simply a discussion about code upgrades. (Pls. Resp. SMF ¶ 72).  Sarno testified in relevant part:

---

[5] Plaintiffs point out that Sarno testified that the discussion about code upgrades was "probably" about the sprinkler system and Modine heaters.  (Sarno Dep. 105; Pls. Resp. SMF ¶ 72).  However, he then testified that the dust-collection system was not part of the code upgrade discussion, so it is unclear what else he could be referring to.

Q:  So, at this point, based upon the determinations of engineers and others, Mass Cabinets was moving forward with those code upgrades that I mentioned previously; Modine heaters, sprinklers, dust collection system?

A:  Yes.

(Sarno Dep. 107).

### c.   Statements by Captain Fluet

Captain Michael Fluet serves as the fire code enforcement official for the Methuen Fire Department.  (Fluet Dep. 19).  On behalf of the Fire Department, he is considered the authority having jurisdiction ("AHJ") over fire prevention systems, including as relevant here, the fire-alarm system, sprinkler system, and dust-collection system.  (Dickover Dep. 53; Fluet Dep. 25).[6]

On September 14, 2018, Captain Fluet wrote an email with the subject line "FW: Mass Cabinets Methuen, MA (Signed & Stamped Issued for Permit) 99 Cross Street - FIRE ALARM PERMIT REVIEWED."  (Pls. Ex. 4).  The email stated:

OK TO PERMIT – Methuen Fire Department

These plans have been reviewed by the Methuen Fire Department and forwarded to the Methuen Building Department.

NOTE: All Fire Protection Systems shall remain in service during renovations.

Plans and work shall comply with all current 780 CMR, 527 CMR 1.00, as well as any NFPA [National Fire Protection Association] regulations that apply per occupancy type.

. . . .

(*Id.*).  The parties dispute whether this email concerns the dust-collection system.   Defendant contends that the subject line and body of the email refer to a fire-alarm permit.  The email does not mention the words "dust" or "collection."  Plaintiffs respond that Fluet's statement that

---

[6] The parties inconsistently identify Captain Fluet or the Department more generally as the AHJ.  The distinction is not material here, so the Court will refer to Captain Fluet as the AHJ.

"[p]lans and work shall comply with . . . any NFPA regulations that apply per occupancy type" is

more generally applicable, and that the email also includes several attachments not related to fire

alarms, including power, electrical, and lighting plans.  Captain Fluet testified that the quoted

text is "standard language" added to approval emails to "ensure that anything reviewed,

regardless of errors or omissions by the reviewer, . . . [is] to be code-compliant."  (Fluet Dep.

95).  Murphy did not see the email until April 2020.  (Murphy Dep. 88).

On August 5, 2019, Captain Fluet wrote an email to Davis.  (Pls. Ex. 13; Def. Ex. 29).

The email provided, in relevant part:

> In the August and September time frame of 2018 printed plans for fire alarm and
> sprinkler work were presented for fire department approval.  Given the nature of
> the plans, these were to be permitted under 780 CMR 9th (Building Code).  My
> recollection is that I met with Paul and Mike? in my office as I had questions
> about their project.  We discussed the minimum expectations of MFD [Methuen
> Fire Department] for documentation before I would let the building department
> know any plans were approved.  In short, I told them that any plans being
> submitted for approval should be compliant with current building and fire codes
> and that we would only sign off on permitted plans.
>
> In April of this year MFD was contacted by Bryan of Dust Pipe.  He asked for a
> meeting to go over the plans for the proposed dust collection system work.  While
> the Chief of the Department was not present the on duty Deputy Chief was.  As
> with earlier plans, my concern was that the system being presented was compliant
> with current building and fire codes.  Bryan assured us that the work would be
> and he explained how the system would tie into the fire alarm and how we would
> address any operational issues.
>
> Although MFD did not specify which systems had to be worked on, we did
> require that any work be compliant with the current codes.
>
> . . . .

(*Id.*).

On January 28, 2020, Davis emailed Captain Fluet, seeking clarification as to whether it

was his intent that the entire dust-collection system be replaced, as opposed to a repair.  (Def. Ex.

5).  Captain Fluet responded that he could not answer unless he was shown an alternative plan.

11

(*Id.*).

Captain Fluet testified at his deposition that he required that all work, of whatever kind, comply with current code: "[M]y statement was that any work to be done would be code-compliant with today's recognized or referenced codes." (Fluet Dep. 39). He later added the following testimony about the sprinkler system:

> Q: Did the submittals propose upgraded systems compared to what was there at the time of the fire?
>
> . . .
>
> A: So the question to me by the property owners is, what did they have to submit, and my answer to them was work compliant with NFPA 72, 2013, and NFPA 13, 2013.
>
> Q: Right, but I'm asking you a question. Were the plans submitted by Mass Cabinets for the fire sprinkler/alarm systems upgraded from the systems they had at the time of the fire?
>
> . . .
>
> A: I would imagine that it was an upgrade because I was requiring current code.
>
> Q: Well, you weren't --- so you required them to upgrade the system?
>
> A: I required them to submit plans current with --- compliant with . . . NFPA 13, 2013 addition. [sic] One of the questions that was asked was, "What do the plans have to" --- "What has to be submitted?"

(*Id.* at 74-75).

With respect to the dust-collection system, Captain Fluet testified that "[w]hatever [plaintiffs] were showing me had to be compliant with current code." (*Id.* at 106; *see also id.* at 88, 111, 125, 151, 156, 158). He "would not accept something other than a plan that met current code" and gave plaintiffs "no discretion." (*Id.* at 112, 152; *see also id.* at 126). On that point, he further elaborated:

> Q: All right, but my question is a little bit narrower in the sense that I'm only asking if Mr. Sarno, as the property owner, as of 2018, had the ability to disregard what 780 CMR, what 527 CMR or the NFPA prescribed relative to code

upgrades?

A:  If there was a threshold that was triggering code upgrades or a requirement, then he would have no discretion; and in our conversation with the plans put in front of me and my statement that the plans that he was presenting be current-code-compliant, I don't believe he would have any discretion as well.

(*Id.* at 114).  If plaintiffs did not comply with "780 CMR, 527 CMR or the NFPA," Captain Fluet testified he would not have "given approvals or sign-offs for the work."  (*Id.* at 128).[7]

Defendant disputes that Captain Fluet ever issued plaintiffs a "directive."  It further contends that he never mandated that plaintiffs replace the entire dust-collection system nor submit replacement plans.  Captain Fluet testified that he never told plaintiffs that they were required to replace the dust-collection system because of any ordinance, law, or code.  (Fluet Dep. 88; *see also* Sarno Dep. 155-56).  He said that he did not "direct [Dustpipe] or anybody at Mass Cabinets to submit a replacement plan of the dust collection system."  (Fluet Dep. 158; *see also id.* at 90, 155-56, 163).  According to him, the plans submitted "could have been much more than what was the minimum standard . . ."  (*Id.* at 156).  He also did not know whether any code provisions were triggered by the fire that would have required replacement of the dust-collection system.  (*Id.* at 81, 88).  He further admitted to not knowing whether any parts of the systems being replaced were in fact damaged by the fire, including the dust-collection system.  (*Id.* at 31-32).

The parties dispute whether Captain Fluet or any other Methuen official approved plaintiffs' sprinkler, fire-alarm, and dust-collection system plans.  Plaintiffs contend that he did.  (Fluet Dep. 118, 124).[8]  George Dickover, Selective's designated deponent, testified that Captain

---

[7] When asked if it was true that "[t]he upgrades to the fire protection and mechanical systems at 99 Cross Street resulted from your enforcement of an ordinance, law or regulation," Captain Fluet replied that he "would say that the approvals would make that true."  (Fluet Dep. 136-37).

[8] Captain Fluet did not specifically mention approving the sprinkler system and fire-alarm plans.  (Fluet Dep. 118, 124).  Instead, he referred generally to a "set of plans for those systems or the systems that we're

Fluet "approved a plan calling for replacement of the dust collector." (Dickover Dep. 178).[9]

Captain Fluet concurred, adding that he determined that the replacement plans were code-compliant after a "cursory review" because, among other things, "[t]hey made the correct references to code." (Fluet Dep. 104, 118, 124).[10]  In contrast, defendant points to Murphy's testimony that Captain Fluet did not approve the plans because "[h]e was incapable and did not have the expertise to approve them." (Murphy Dep. 197).  Murphy further testified that Captain Fluet did not determine that the replacement plan complied with current code.  (*Id.* at 198).

The parties agree that in theory the dust-collection system could have been repaired. Murphy testified that assuming the repair was performed properly, the dust-collection system would have been equally safe as before the fire.  (Murphy Dep. 114).  However, Sarno testified that he did not know whether Captain Fluet would have permitted a repair.  (Sarno Dep. 155-56). Dickover, when asked whether it was "Selective's position that the Methuen Fire Department would have approved the repair plans and preserved the grandfathered status for those systems," answered that he did not know what they would or would not have approved.  (Dickover Dep. 96; *see also id.* at 88, 178, 247).  Selective's code consultant, Davis, similarly said he did not "want to speculate as to what [the Methuen Fire Department] would or would not approve." (Davis Dep. 52).

---

discussing," and "the plans that were submitted" by plaintiffs.  (*Id.*).  However, there is an Application for Fire Alarm and Sprinkler Permit in the record to "install fire alarm."  (Pls. Ex. 15).  The status of the permit was "approved."  (*Id.*).

[9] Notwithstanding the admission by Dickover that Captain Fluet was presented with and approved a plan for the replacement of the dust-collection system, defendant disputes this fact on the basis that there is no document from Captain Fluet or Methuen showing approval of that plan.  (Def. Resp. SMF at 11).  Plaintiffs, however, have supplied a "Sheet Metal Permit" issued on April 23, 2019, that states that "duct [sic] collection system per plan" was approved.  (Pls. Ex. 5).

[10] With respect to the dust-collection system, Fluet also "relied on the submitter to attest that it made code." (Fluet Dep. 105).

Captain Fluet himself testified that he never had sufficient information to determine whether the sprinkler and dust-collection systems could have been repaired and still be code-compliant.  (Fluet Dep. 76, 89; *see also id.* at 124).[11]  He did not know whether he would have approved a repair plan because it would depend on the context of what was submitted, but it was "possible."  (*Id.* at 126-27, 77-78; *see also id.* at 155, 163).[12]  He further stated that "[i]t wouldn't be where I would typically go with plan review . . . to try to protect old code.  I would always try to achieve the best current standard."  (*Id.* at 76).  From a "life safety perspective," Fluet agreed that it would be preferable to have a dust-collection system that is compliant with current code, and that he would be more skeptical of a plan only calling for replacement of damaged components.  (*Id.* at 140).  Selective is unaware of any documentation from Captain Fluet stating that plaintiffs could repair the dust-collection system and remain "up to current code." (Dickover Dep. 95).

As for the sprinkler system, Captain Fluet admitted that he never made a determination as to whether that system was non-compliant at the time of the fire.  (Fluet Dep. 81).  He also did not know if the fire triggered any compliance issue with respect to the sprinkler system.  (*Id.*). However, plaintiffs met with Captain Fluet at some point between June 6 and August 8, 2018, to review permit drawings, discuss the fire department's requirements, and go over calculations for the sprinkler system.  (Sarno Dep. 110-12).  During that meeting, Captain Fluet said he could not comment about the Modine heaters because "it was outside of his jurisdiction."  (*Id.* at 111).  The

---

[11] As to the fire-alarm system, Fluet testified that he "would almost guarantee . . . that [the] fire alarm system wouldn't be able to be made current code-compliant" if it was repaired.  (Fluet Dep. 159; *see also id.* at 142). As to the dust-collection system, he testified that he thought "the technologies and abilities in the modernization of the requirements would make that system hard to . . . meet the newer code" and it was "not likely that they could use old stuff and make it modern compliant."  (*Id.*).

[12] He also added that it was "also possible the plans they submitted, [he] could probably find insufficiencies with current code."  (Fluet Dep. 160).

dust-collection system was not a topic of conversation.  (*Id.* at 110).  According to Sarno, Captain Fluet said that "all items that you do must meet current code."  (*Id.*).

As for the Modine heaters, the parties dispute whether a gas inspector from Methuen, such as Quinlan, ever ordered plaintiffs to replace them.  Defendant points to Quinlan's testimony that he never told plaintiffs that the Modine heaters had to be replaced, because of the fire or otherwise.  (Quinlan Dep. 35-38, 44).  Quinlan did, however, add that "the only conversation I had about -- with anything do with those Modine heaters was they could not continue the use of those under the circumstances."  (*Id.* at 35).  He felt that the Modine heaters "were unsafe because of the way they were using the building . . . the intended use of a Modine heater was not to allow it to be in an area where there were flammable vapors or large dust accumulation."  (*Id.* at 34).  Sarno testified that Quinlan told him, "as long as you're continuing to be a woodworking shop that makes dust, you cannot have open flame heaters in your building."  (Sarno Dep. 169-70).

### B.  <u>Procedural Background</u>

On April 15, 2020, plaintiffs brought this action against defendant in Massachusetts Superior Court.  Count 1 seeks a declaratory judgment that insurance coverage is available and owed to plaintiffs.  Count 2 alleges breach of contract by failing to afford coverage and indemnify plaintiffs.  Count 3 alleges unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A.  On May 14, 2020, defendant removed the case to this Court pursuant to 28 U.S.C. § 1441.

The parties have cross-moved for summary judgment.  Plaintiffs have moved for summary judgment on Counts 1 and 2, and defendant has moved on all counts.  Defendant has also moved to exclude the testimony of two experts for plaintiffs:  John Constance and Bryan Murphy.  Plaintiffs have moved to stay those *Daubert* motions pending resolution of the

summary-judgment motions.

## II.   **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   **Analysis**

### A.   **Breach of Contract**

Plaintiffs' principal claim is that defendant breached the policy by failing to provide coverage and indemnify plaintiffs.  Under Massachusetts law, "[t]he proper interpretation of an insurance policy is a matter of law to be decided by a court, not a jury." *U.S. Liability Ins. Co. v. Benchmark Constr. Servs., Inc.*, 797 F.3d 116, 119 (1st Cir. 2015) (quoting *Boazova v. Safety*

*Ins. Co.*, 462 Mass. 346, 350 (2012)).[13]  When "the material facts upon which a coverage question is based are not genuinely in dispute, the application of the policy to those facts is likewise a question of law . . . properly resolved on summary judgment." *B & T Masonry Const. Co. v. Public Serv. Mut. Ins. Co.*, 382 F.3d 36, 38-39 (1st Cir. 2004).

An insurance policy is to be construed "under the general rules of contract interpretation," starting with "the actual language of the policies, given its plain and ordinary meaning." *AIG Property Cas. Co. v. Cosby*, 892 F.3d 25, 27 (1st Cir. 2018) (quoting *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000)).  "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable . . . without according undue emphasis to any particular part over another." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355-56 (2009) (internal quotation marks and citations omitted).

When in doubt, a court must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.*  Any ambiguities in an insurance policy "are to be construed against the insurer and in favor of the insured." *U.S. Liability Ins. Co.*, 797 F.3d at 120.  "An ambiguity arises when there is more than one rational interpretation of the relevant policy language," but "is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Boston Gas Co.*, 454 Mass. at 356 n.32 (internal citations omitted).  "While the insured bears the burden of establishing coverage, . . . the burden is on the insurer to establish the applicability of an exclusion." *Finn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 452 Mass. 690, 693 (2008).

Here, the critical provision in the policy is the agreement to pay increased cost "to the

---

[13] The parties do not appear to dispute that Massachusetts law applies.

extent it results from enforcement of an ordinance or law." (Def. Ex. 3, 127). Plaintiffs contend that defendant breached that promise by failing to pay for their new dust-collection system ($421,747); Modine hanging heaters ($64,015.80); sprinkler system ($60,043.29); and glue booth refurbishment and electrical work ($12,125).[14] Those claims, according to plaintiffs, were the result of Captain Fluet's enforcement of the City of Methuen fire codes. Defendant contends that plaintiffs cannot show that those increased costs resulted from any enforcement of an ordinance or law because Captain Fluet never specifically required replacement of the dust-collection system or any other upgrades.

The threshold question, therefore, is whether there was any "enforcement of an ordinance or law" within the meaning of the policy.

### 1. "Enforcement"

The first question is what constitutes "enforcement" under the policy. There is no dispute that Captain Fluet serves as the AHJ over fire-prevention systems, and therefore has enforcement authority for the relevant building or fire codes. The issue, therefore, is whether his various statements that plaintiffs were required to submit plans that were "compliant with current code" qualify as "enforcement" within the meaning of the policy.

To begin, it is clear that the term "enforcement" must have some distinct meaning from "ordinance or law"; the policy does not say simply that the insurer will cover additional costs incurred to bring a property up to code. *See Commonwealth Ins. Co. of Am. v. Grays Harbor County*, 84 P.3d 304, 308 (Wash. App. Ct. 2004) (stating that "[t]he phrase 'enforcement of any law' focuses not on what the code might legally require but on what the building official requires

---

[14] Plaintiffs also discuss certain fire-alarm upgrades. The relevance of those upgrades is unclear, because the parties agree that defendant already paid for fire-alarm upgrades as direct building damage. (Dickover Dep. 81).

(enforces)"); *Boston Gas Co.*, 454 Mass. at 355 ("Every word in an insurance contract must be presumed to have been employed with a purpose").  At a minimum, therefore, the term "enforcement" necessarily contemplates some form of statement or action undertaken by an official with authority to enforce an ordinance or code.

The difficulty arises from the fact that "enforcement" may take many forms, and there are no clear boundaries as to what is enforcement and what is not.  For example, an official might take a specific action in response to an existing violation:  "I reject this work and order you to redo it to comply with current code."  Clearly such an order would qualify as an enforcement action.  But an official might also (as here) issue a more generalized, forward-looking, statement: "Whatever you do must comply with current code, or I will not approve it."  In either circumstance, the owner must comply with code, in accordance with the direction of an official having enforcement authority over the project, or a permit will not issue.  And that is true whether the "enforcement" in question consists of a formal action or a statement, whether it is specific to a particular problem or more generalized, and whether it is forward-looking or addresses an existing violation.

Defendant asserts that "enforcement" can only encompass a narrow range of actions, such as a corrective notice or a compliance order issued in response to an existing violation.  *See 30122 Niguel Apartments, LLC v. Rsui Indemnity Co.,* 2013 WL 11320318, at *1-2 (C.D. Cal. July 29, 2013) (city issued corrective notices, red-tagged buildings as life and safety hazards, evacuated tenants, and required prior approval of repair plans); *Farrell v. Royal Ins. Co. of Am.*, 989 F. Supp. 159, 166 (D. Conn. 1997) (fire department wrote letter requiring plaintiffs to remove tank to comply with Connecticut law); *Commonwealth Ins. Co. of Am.*, 84 P.3d at 305 (building official required six upgrades as condition of issuing permit).  It notes that Captain

Fluet testified that he never actually mandated or directed that plaintiffs replace the dust-collection system or submit replacement plans.  He also never told them specifically to replace the dust-collection system because of any ordinance, law, or code; in fact, he did not know whether any code provisions were triggered by the fire that would have required replacement. He further stated that he did not specify any particular system that had to be worked on, and that the plans submitted could have been much more than the minimum standard.

Plaintiffs argue for a broad reading of the term "enforcement," citing to cases that contemplate a city's permitting process as enforcement of an ordinance or law.  *See Windowizards, Inc. v. Charter Oak Fire Ins. Co.*, 2015 WL 1400726, at *5-6 (E.D. Pa. Mar. 27, 2015); *Travelers Indem. Co. of Am. v. Deauville Hotel Prop., LLC*, 533 F. Supp. 3d 1287, 1295 (S.D. Fla. 2021); *Brandywine Flowers, Inc. v. West Am. Ins. Co.*, 1993 WL 133176, at *2-3 (Del. Super Ct. Apr. 19, 1993); *Singh v. Amguard Ins. Co.*, 2017 WL 2423795, at *4 (C.D. Cal. Feb. 17, 2017).[15]

It is not immediately obvious why a narrow interpretation of "enforcement" is required—or, to be more precise, why that is a rational interpretation of the policy, but a broader interpretation is not.  Again, there is little meaningful difference, as a practical matter, between an official telling an insured (1) "whatever you do must be up to code," (2) "what you have specifically proposed is not up to code," and (3) "what you have constructed is not up to code." In all three scenarios, an official with enforcement authority has directed that a project will not

---

[15] The court in *Windowizards* "conclude[d] that enforcement begins with the passing of relevant ordinances and continues with either the granting or denial of a permit, or the issuance of a violation." 2015 WL 1400726, at *5-6.  That court relied on *Brandywine Flowers*, 1993 WL 133176, where the insured "would have violated the law if it had commenced reconstruction without first obtaining a building permit, [ ] and it had to obtain a variance in order to get the building permit."  *Id.* at *6.  It also cited *Bischel. v. Fire Ins. Exch.*, 1 Cal. App. 4th 1168 (Cal. Ct. App. 1991) for the proposition that "[i]mplementing building standards and withholding permits for construction in violation of those standards is how the city carries out the mandate or command of the municipal code provisions." *Id.*

be approved, and a permit will not be granted, unless the owner takes certain actions to comply with the code.  The owner's compliance is not voluntary under any of those scenarios.  For that reason, among others, "an objectively reasonable insured, reading the relevant policy language," would expect that the policy would provide coverage for additional costs mandated by city officials in light of code requirements.  *Boston Gas Co.*, 454 Mass. at 355-56.

Furthermore, the interpretation favored by the insurer would lead to peculiar results. Under that interpretation, an insured who made a good-faith effort to respond to an official's concerns, and submitted plans that were code-compliant, would have no insurance coverage.  An insured who neglected to do so, or even defied the official's directives, would have coverage— but only if he were caught and ordered to comply with the code.  Such an interpretation would encourage insureds to submit plans, or undertake construction activities, that were not code-compliant.  It would also encourage disputes and discourage insureds from working cooperatively with city officials to promote safety and compliance with the law.

It also bears mentioning that the insurer drafted the policy, and was presumably free to add limiting language to provide a more narrow scope of coverage.  As written, the policy uses the term "enforcement," without limitation.   It does not limit that to formal orders or formal actions, which would have been easy enough to do if that was what was intended.

In any event, the issue is that the term "enforcement" is susceptible of multiple rational interpretations, both broad and narrow.  *See Valley Forge Ins. Co. v. Field*, 670 F.3d 93, 97 (1st Cir. 2012).[16]  It is true that ambiguity is not created simply because each party has a different

---

[16] That does not, of course, mean that every comment, or suggestion, or recommendation by an official qualifies as "enforcement."  *See Harbor Cmtys., LLC v. Landmark Am. Ins. Co.*, 2008 WL 2986424, at *8 (S.D. Fla. Aug. 4, 2008) (finding no enforcement of law or ordinance where letter from OSHA "strongly recommended" that party perform forensic demolition).  Captain Fluet's comments, fairly interpreted, represented a clear direction, in connection with a specific project, that he would not approve any plan that was non-compliant; he was not simply offering helpful suggestions.

interpretation of a term.  *See Boston Gas Co.*, 454 Mass. at 356 n.32.  Nonetheless, "reasonably

intelligent persons [may] differ" as to its meaning, which is sufficient to establish ambiguity.

*See Dorchester Mut. Ins. Co. v. Krusell*, 485 Mass. 431, 437 (2020).

In accordance with standard principles of policy interpretation, the Court will construe

that ambiguity in favor of the insured.  *U.S. Liability Ins. Co.*, 797 F.3d at 120.  Captain Fluet's

statements that any work must comply with current code therefore qualify as "enforcement"

within the meaning of the policy.  *See Performance Trans., Inc. v. General Star Indemnity Co.*,

983 F.3d 20, 25 (1st Cir. 2020).

## 2. <u>"Ordinance or Law"</u>

The next question is what "ordinance or law" applied to the work in question, and what

that ordinance or law required.

Although Captain Fluet repeatedly stated that plaintiffs must comply with "current code,"

he usually failed to specify any particular code provision when he did so.  However, at least

once, he mentioned "780 CMR, 527 CMR 1.00, as well as any NFPA regulations that apply per

occupancy type."  (Pls. Ex. 4).[17]  He also testified that he told plaintiffs to submit work

compliant with NFPA 13 and 72.  (Fluet Dep. 74-75).[18]

The NFPA is the National Fire Protection Association, a private organization that

publishes standards and codes related to fire protection.  The Massachusetts Comprehensive Fire

---

[17] That reference is weakened by Captain Fluet's testimony that the quoted text was "standard language" added to all approval emails.  (Fluet Dep. 95).  The email also appears to concern a fire-alarm permit, not the systems at issue here.  (Pls. Ex. 4).

[18] In addition to those code references, the parties debate the applicability of the International Existing Building Code ("IEBC").  Defendant's disclaimer was based on its conclusion that plaintiffs could have repaired the damaged ductwork of the dust-collection system pursuant to the 2015 IEBC and made the system no less conforming or safe than before the fire.  However, plaintiffs contend that the IEBC does not regulate dust-collection systems because they are not "equipment or fixtures" capable of being repaired under the IEBC.  In any event, because plaintiffs contend that the IEBC does not apply, they do not rest their argument on it.

Safety Code, 527 C.M.R. 1.00, adopts and incorporates the provisions of the NFPA 1: Fire

Code.[19]  Plaintiffs generally assert that the NFPA code regulates dust-collection and sprinkler

systems such as the ones at issue here.[20]  Defendant responds that the current NFPA code does

not apply because plaintiffs do not have a "new facility" or a "new process within an existing

facility."  *See* 2017 NFPA 664, § 1.3 (stating that "standard shall be applied to new facilities and

to new processes within existing facilities").[21]  However, Section 1.5.4 of the code addresses

renovations to existing facilities, providing that "[w]hen renovating existing facilities,

---

[19] NFPA 1 incorporates other NFPA standards, including two relevant here:

**Chapter 13 Fire Protection Systems**
**13.3 Automatic Sprinklers**

**13.3.1.2** Installations shall be in accordance with NFPA 13, *Standard for the Installation of Sprinkler Systems*, NFPA 13R, *Standard for the Installation of Sprinkler Systems in Low-Rise Residential Occupancies*, or NFPA 13D, *Standard for the Installation of Sprinkler Systems in One- and Two-Family Dwellings and Manufactured Homes*, as appropriate.

**Chapter 40 Dust Explosion and Fire Prevention**
**40.1 General.**  Equipment, processes, and operations that involve the manufacture, processing, blending, repackaging, or handling of combustible particulate solids or combustible dusts regardless of concentration or particle size shall be installed and maintained in accordance with this chapter and the following standards as applicable:
. . .
(8) NFPA 664, *Standard for the Prevention of Fires and Explosions in Wood Processing and Woodworking Facilities*

2015 NFPA 1, §§ 13.3, 40.1.

[20] Plaintiffs cite to five cases in which courts have apparently discussed the NFPA code in connection with dust-collection systems.  *See Quadrant EPP USA, Inc. v. Menasha Corp.*, 2010 WL 3855549, at *6 (E.D. Pa. Sept. 30, 2010); *Tucker v. Rees-Memphis, Inc.*, 17 So.3d 122, 126-27 (Miss. Ct. App. 2009); *Morris v. Aircon Corp.*, 2017 WL 9325374, at *5-7 (E.D. Tx. July 6, 2017); *Hodges v. Fed. Mogul Corp.*, 621 Fed. App'x 735, 739 (4th Cir. 2015); *Tate v. Lyle Americas LLC v. Glatt Air Techniques, Inc.*, 2016 WL 9686244, at *2 (C.D. Ill. June 2, 2016). They have included administrative codes of various states that in some respect tie dust-collection systems to applicable provisions of the NFPA code.  (*See* Pls. Opp., Addendum A).  They have also pointed to two Occupational Safety and Health Administration ("OSHA") regulations, 29 C.F.R. §§ 1910.94 and 1926.57, as evidence that the NFPA applies to dust-collection systems.  For example, § 1926.57 provides in relevant part, "Where flammable or explosive dust mixtures may be present, the construction of the equipment, including the exhaust system and all electric wiring, shall conform to the requirements of American National Standard Installation of Blower and Exhaust Systems for Dust, Stock, and Vapor Removal or Conveying, Z33.1-I96I (NFPA 91-1961) . . . ."

[21] Indeed, plaintiffs admit that neither their facility nor dust-collection system were "new" or "new processes" under the NFPA code.  (Pls. Resp. SMF ¶¶ 88-89).  They nevertheless contend that the NFPA code applies because the AHJ decided that an existing system needed to comply with current code.  (*Id.*).

equipment, or processes, provisions of this standard shall apply to that portion of the facility, equipment, or process."  *Id.* § 1.5.4.  Thus, under the circumstances, it appears that the NFPA code applies here.[22]

The next question is what the NFPA code required plaintiffs to do.

### a.      Dust-Collection and Sprinkler Systems

Plaintiffs replaced the dust-collection and sprinkler systems with new, upgraded systems. There is no dispute that the new systems comply with current code.  There is likewise no dispute that the old systems would not comply with the current code if they had been installed in 2017. Rather, the dispute concerns whether the policy covers the upgrades, as opposed to a repair or replacement in kind (that is, replacement that satisfies the existing design specification).

Plaintiffs contend that Captain Fluet's direction that they must comply with current code "is reasonably susceptible of only one interpretation"—that they were required to replace the dust-collection and sprinkler systems with entirely new, upgraded systems rather than a repair or replacement in kind.  They point to his statements that he does not "try to protect old code" and "always [tries] to achieve the best current standard."  (Fluet Dep. 76).

Requiring replacement is not the same thing as requiring compliance with current code; plaintiffs conflate those concepts.  Although plaintiffs elected to replace and upgrade their dust-collection system, NFPA 664 would have permitted repair or replacement in kind without triggering the new code's requirements.[23]  Section 1.5.4 provides the following:

**1.5.4\*** When renovating existing facilities, equipment, or processes, provisions of

---

[22] If for some reason the NFPA does not apply at all, the outcome remains the same.  Plaintiffs' sole theory is that Captain Fluet had authority to retroactively enforce the NFPA.  Thus, defendant would also be entitled to summary judgment if the NFPA did not apply.

[23] Further reinforcing that point, plaintiffs repaired certain components of their existing dust-collection system in 2013 without triggering any new code requirements.  They acknowledged that no code or city official required them at that time to replace the entire system.

this standard shall apply to that portion of the facility, equipment, or process. . . .

> **\*Annex A.1.5.4** The retroactivity of the standard is triggered when a change is made that changes the existing design of the process.  This is basically anything other than a "replacement in kind."

2017 NFPA 664, § 1.5.4.  Thus, Captain Fluet's direction to "comply with current code" did not *require* plaintiffs to incur the cost of an entirely new upgraded system as the result of enforcement of an ordinance or law—they could have repaired the existing system or made replacements in kind and still complied with the code.

Of course, no one, including Captain Fluet, knows if he would have approved plans calling for a repair or replacement in kind.  As set forth below, it is entirely possible that after review of such plans he might have required a new, upgraded system.  Plaintiffs thus contend that the Court should not "speculate" whether he would have approved a hypothetical repair plan.  But that is not the question before the Court.  The issue is whether these actual increased costs, not hypothetical ones, resulted from enforcement of an ordinance or law.

It is also true that in some circumstances, the NFPA permits retroactive enforcement. The following NFPA 664 provisions on retroactivity are relevant:

**1.5  Retroactivity.**  The provisions of this standard reflect a consensus of what is necessary to provide an acceptable degree of protection from the hazards addressed in this standard at the time the standard was issued.

**1.5.1**  Unless otherwise specified, the provisions of this standard shall not apply to facilities, equipment, structures, or installations that existed or were approved for construction or installation prior to the effective date of the standard.  Where specified, the provisions of this standard shall be retroactive.

**1.5.2**  In those cases where the authority having jurisdiction determines that the existing situation presents an unacceptable degree of risk, the authority having jurisdiction shall be permitted to apply retroactively any portions of this standard deemed appropriate. . . .

2017 NFPA 664, § 1.5.[24]   NFPA 13, which governs the installation of sprinkler systems, includes

identical language.  *See* 2016 NFPA 13, § 1.4.[25]

Here, however, none of Captain Fluet's statements indicate that he is intending to apply

the current version of the NFPA retroactively.  He never concluded that a particular system

presented "an unacceptable degree of risk"; in fact, he did not even address any specific system

or "existing situation" at all.  The AHJ's authority to require retroactive compliance with the

NFPA—which he never exercised—does not reflect what actually occurred here.

Plaintiffs cite *DEB Assocs. v. Greater N.J. Mut. Ins. Co.*, 970 A.2d 1074 (N.J. App. Div.

2009).  There, a windstorm damaged an eight-story office building, causing debris to fall onto

the parking lot and adjacent highway.  *Id.* at 1075.  Local code officials came to inspect damage

to the seventh floor and discovered that the walls did not have certain steel fasteners.  *Id.*  Those

inspections triggered an insurance dispute about whether an "ordinance or law" clause applied

where damage to one portion of the building caused code officials to require repairs to separate

undamaged portions of the building.  *Id.* at 1077.  The court ultimately affirmed coverage after

considering a policy similar to the one at hand.  *Id.* at 1076.  Plaintiffs direct the Court's attention

to a single statement in the opinion:  "the policy did not specifically exclude situations

where . . . a covered structure was grandfathered under the current code but lost its grandfathered

status because of the occurrence of covered damage."  *Id.* at 1083.  But the issue was not limited

---

[24] Plaintiffs cite to the 2012 version of NFPA 664 with no explanation.  Defendant cites to the 2017 version, which has "an effective date of June 2, 2016, and supersedes all previous editions," because the fire occurred in April 2017.  *See* 2017 NFPA 664, Introduction.

[25] Plaintiffs also cite to NFPA 72, which governs fire-alarm systems.  It is unclear why that is applicable here, where defendant has already paid for the fire-alarm upgrades.  In any case, even if it were applicable, the retroactivity language is materially the same.  *See* 2016 NFPA 72, § 1.4.2 ("In those cases where it is determined by the authority having jurisdiction that the existing situation involves a distinct hazard to life or property, retroactive application of the provisions of this document shall be permitted.")

to the policy language; how the code was enforced was also critical:

> These factors—the collapse of the seventh floor wall, and the unstable condition
> of the remaining walls—led the municipal code official, Gerry Seneski, to
> *conclude that the building would be unsafe unless brought up to current code
> standards*. On December 12, 2003, Seneski issued a notice of unsafe structure,
> pursuant to N.J.A.C. 5:23–2.32. He ordered that the building be vacated, and as a
> condition of re-occupancy, required that the walls on floors two through eight,
> and the roof, be secured to the structure with angle irons, so as to comply with the
> then-current State construction code. *See* 1076 N.J.A.C. 5:23–3.14(a)(1)
> (adopting International Building Code); International Building Code § 2109.7.2
> (2000 ed.) (requiring angle irons); N.J.A.C. 5:23–6.2(f) (*renovation subcode
> grandfathers lawful pre-existing buildings, except for unsafe structures*). These
> repairs, without which the code official would not issue a certificate of
> occupancy, cost approximately a half-million dollars.

*Id.* at 1075-76 (emphasis added).[26]

Here, the retroactivity provisions of the NFPA were not invoked by Captain Fluet. He
never concluded that the building would be unsafe unless it was brought up to current code. He
never issued a notice of unsafe structure or an order to abate. He never ordered that the building
be vacated. He did not set conditions of re-occupancy. He did not withhold a certificate of
occupancy until certain renovations were made. He did not even specify which of plaintiffs'
systems had to be worked on. And he did not specify that replacement of those systems was
required. Thus, his statements did not trigger the NFPA's retroactivity provisions or cause
plaintiffs to "lo[se] [their] grandfathered status." *Cf. id.* at 1083.

Finally, plaintiffs contend that interpreting the policy to cover repair or replacement in
kind, but not an upgraded system, amounts to reading a "minimum requirements" provision into
the policy.[27] In substance, they argue that the policy does not provide that it covers only the

---

[26] Plaintiffs also cite to *Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, where the court noted in
*dicta* that the "breadth of the [policy] provision is not diminished by any limiting language regarding the
'grandfathered' status of code violations." 136 F. Supp. 2d 901, 911 (W.D. Tenn. 2001). The issue, however, is not
merely what the policy says, but also what the code required.

[27] Plaintiffs cite to several cases where policies included such language. *See Fox v. Am. Econ. Ins. Co.*,
2012 WL 512585, at *2 (N.D. Ill. Feb. 14, 2012); *Sunflower Condo. Ass'n, Inc. v. Everest Nat'l Ins. Co.*, 2020 WL

minimum repair or replacement necessary to comply with the code.  They cite to *30122 Niguel Apartments, LLC v. Rsui Indemnity Co.* as an example where a court did not read the term "minimum requirements" into a policy with an "ordinance or law" provision.  2013 WL 11320318, at *6.  There, the court declined "to read [a] minimum requirements limitation into the [policy] . . . [because] [t]he opening paragraph . . . , which modifies the list of covered damages, does not use the term 'minimum requirements,' but instead broadly states that it covers compliance with or enforcement of '*any* law, rule, regulation, or ordinance' related to building." *Id*.  Even if the Court were to consider this to be persuasive authority, it is significant that the word "minimum" *did* appear in one of the four types of covered damage in that policy, which "strongly suggest[ed] that coverage of *other* damages [was] not limited by the minimum requirements of law."  *Id.*

Here, it is true that the term "minimum requirements" is not found in the policy.  But plaintiffs were only entitled to increased costs to the extent those costs resulted from enforcement of an ordinance or law.  As defendant asserts, "plaintiffs fail to demonstrate how, absent a mandate from the AHJ, the *extent* of their damages (i.e. replacement costs) resulted from an ordinance or law."  (Def. Reply at 3).  Plaintiffs' reading—that the endorsement does not "disallow[] coverage when the plaintiffs pursue the most expensive means of [satisfying the directions of the AHJ]"—has no limiting principle and is not connected to the text of the policy. (Pls. Mem. at 12).  Coverage is provided for increased costs resulting from enforcement of an ordinance or law; it does not provide coverage for more expensive replacement systems, simply

---

5757085, at *1 (S.D. Fla. Sept. 28, 2020); *Great Am. Ins. Co. of N.Y. v. Jackson Co. Sch. Dist. No. 9, Eagle Point*, 2008 WL 2477576, at *3 (D. Or. June 16, 2008).  As defendant notes, some of those cases do not even turn on the "minimum requirements" policy language at all.  *See, e.g.*, *Great Am. Ins. Co. of N.Y.*, 2008 WL 2477576, at *3 (finding that Title IX was not an ordinance or law as defined by the increased cost of construction coverage endorsement).

because such systems would comply with current code.

Again, if Captain Fluet had mandated a new, upgraded system pursuant to NFPA 664, § 1.5 or NFPA 13, § 1.4, the policy would likely cover that increased cost.  He did not, however, do so, and therefore no "enforcement of an ordinance or law" triggered additional coverage under the policy.

In light of the foregoing, plaintiffs are not entitled to coverage for additional costs expended to upgrade their dust-collection or sprinkler systems to comply with current code requirements.

### b.        Modine Heaters and Glue Booth

Plaintiffs did not argue in their briefs that replacement of the Modine heaters or upgrades to the glue booth were required by the enforcement of any ordinance or law.[28]  Summary judgment is therefore appropriate as to those claims.[29]

In summary, the Court will therefore grant summary judgment to defendant as to Count 2.

### B.        Declaratory Judgment

Plaintiffs also seek a declaration that insurance coverage is available and owed to them. That claim, however, seeks resolution of legal issues that are necessarily resolved by the breach-of-contract claim, as decided above.

"[R]endering a declaration would not be of any practical assistance to clarifying the

---

[28] In fact, with respect to the Modine heaters, Quinlan testified that he never told plaintiffs that they had to be replaced, because of the fire or otherwise.  (Quinlan Dep. 35-38, 44).

[29] The "district court is free to disregard arguments [on summary judgment] that are not adequately developed."  *Mackey v. Town of Tewksbury*, 433 F. Supp. 3d 116, 163 (D. Mass. 2020) (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999)).  And the First Circuit's "raise-or-waive" rule applies "where a plaintiff properly raises an issue in his complaint, but then fails to adequately address it as part of his summary judgment argument."  *Rocafort v. IBM Corp.*, 334 F.3d 115, 121 (1st Cir. 2003).

merits of [plaintiffs'] underlying claims where resolving the breach of contract claim will settle the principal legal issue." *O'Hara v. Standard Fire Ins. Co.,* 2017 WL 8315886, at *7 (D. Mass. Sept. 8, 2017) (citations omitted); *Guilfoile v. Shields Pharmacy, LLC*, 2021 WL 4459515, at *5 (D. Mass. Sept. 29, 2021); *Carando Gourmet Frozen Foods Corp. v. Axis Automation, LLC*, 458 F. Supp. 3d 60, 75 (D. Mass. 2020) (granting summary judgment to defendant on declaratory-judgment claim that rested on same facts and legal theories as breach-of-contract claim). Accordingly, the Court will grant summary judgment to defendant as to Count 1.

### C.    Chapter 93A

Finally, plaintiffs contend that defendant engaged in unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A.

To trigger liability under ch. 93A, the conduct in question must fall within "'the penumbra of some common-law, statutory, or other established concept of unfairness' or [be] 'immoral, unethical, oppressive or unscrupulous.'" *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000) (quoting *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996) (alteration in original)). "A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct." *Id.* (citing *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996), and *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451 (Mass. 1991)).

Section 3(9) of ch. 176D provides a set of "acts [and] omissions" that qualify as "unfair claim settlement practice[s]" under Massachusetts law. Plaintiffs cite three unfair practices:

Section 3(9)(a): Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue

Section 3(9)(d): Refusing to pay claims without conducting a reasonable investigation based upon all available information

31

> Section 3(9)(g):  Compelling insureds to institute litigation to recover amounts
> due under an insurance policy by offering substantially less than the amounts
> ultimately recovered in actions brought by such insureds

Mass. Gen. Laws ch. 176D, § 3(9).

Generally, claims under Chapters 93A and 176D "[fall] away by derivation" once a court

determines that denial of coverage is proper.  *Aguiar v. Generali Assicurazioni Ins. Co.*, 47

Mass. App. Ct. 687, 692 (Mass. App. Ct. 1999) (affirming trial court determination that insurer

properly denied coverage for fire loss and, therefore, claims asserting unfair settlement practices

against insurer were unsustainable).

Here, defendant disclaimed coverage after conducting a reasonable investigation and

consulting with a code compliance expert.  And for the reasons explained above, the Court has

determined that defendant had the right to disclaim coverage.  It therefore had a reasonable

foundation for denying coverage and was not acting in bad faith when it did so.

Accordingly, the Court will grant summary judgment to defendant as to Count 3.

**D.**     **Motions to Strike**

Defendant has also moved to exclude the expert reports and testimony of two experts for

plaintiffs:  John Constance and Bryan Murphy.  It first contends that Constance does not have

experience in applying the IEBC, advising others on its application, or repairing dust-collection

systems.  With respect to Murphy, who also serves as a fact witness in this dispute, defendant

asserts that he does not have the requisite expertise to opine on the application of building codes

to the systems at issue.  It further contends that Murphy's analysis of the IEBC and NFPA is

inadequate.  Plaintiffs have moved to stay those *Daubert* motions pending resolution of the

summary-judgment motions.

"Because the summary judgment process does not conform well to the discipline that

*Daubert* imposes, the *Daubert* regime should be employed only with great care and

circumspection at the summary judgment stage." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997); *accord Town of Westport v. Monsanto Co.*, 2017 WL 1347671, at *3 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st Cir. 2017) (denying motions to exclude expert testimony where "summary judgment analysis and conclusion do not meaningfully rely upon either expert and, therefore, the Court's outcome would remain the same even if exclusion . . . was warranted").

As set forth above, the Court has considered each party's legal arguments regarding the applicability of relevant codes.  Other than Murphy's observations as a fact witness, the Court did not rely on the statements or reports of any expert.  And the Court's ultimate conclusion would remain the same regardless of the disposition of the *Daubert* motions.

Accordingly, the Court will deny as moot defendant's motions to exclude testimony and plaintiffs' motion to stay.

## IV.    <u>Conclusion</u>

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and plaintiffs' motion for summary judgment is DENIED.  Defendant's motions to exclude the testimony of John Constance and Bryan Murphy and plaintiffs' motion to stay are DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated: March 31, 2022                Chief Judge, United States District Court